CLARE E. CONNORS
United States Attorney
District of Hawaii

MICHAEL F. ALBANESE #9421
W. KEAUPUNI AKINA #11565
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
E-mail:   michael.albanese@usdoj.gov
          Keaupuni.akina@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 19-00114 HG (1) |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM; CERTIFICATE |
| vs. | ) | OF SERVICE |
| | ) | |
| BRIAN AHAKUELO,   (1) | ) | Sentencing Hearing: |
| | ) | Date: June 20, 2023 |
| Defendant. | ) | Time: 1:30 p.m. |
| | ) | Judge: The Honorable Helen Gillmor |
| | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America ("United States"), by its counsel, Clare E.

Connors, United States Attorney for the District of Hawaii, and Michael F.

Albanese and W. KeAupuni Akina, Assistant United States Attorneys, hereby submits this Sentencing Memorandum in advance of the sentencing hearing of Defendant Brian Ahakuelo on June 20, 2023.   For the reasons that follow, taking into account the relevant factors in Title 18, United States Code, Section 3553(a), the United States recommends a sentence of 168 months of imprisonment[1] followed by three years of supervised release.   In addition to any sentence of imprisonment, the government respectfully recommends that the Court enter an order of restitution in the amount recommended by probation ($209,391.72) as well as a forfeiture money judgment, as previously entered by this Court on March 15, 2023, Dkt. No. 310.

## I.   STATEMENT OF THE CASE

On August 22, 2019, an indictment was filed against the defendant, along with his wife, co-defendant Marilyn Ahakuelo, charging (with respect to this defendant) conspiracy, wire fraud, money laundering, and embezzlement from a labor union.   Presentence Investigation Report ("PSR"), Dkt. No. 326, at ¶¶ 1-13. From October 14, 2022 through November 18, 2022, the defendant appeared for a jury trial, after which the defendant was adjudged guilty as to all remaining counts

---

[1] This sentence should be imposed as follows: 60 months as to each of Counts 1, 64, 65, and 67 through 70; 168 months as to each of Counts 2 through 43, 120 months as to each of Counts 44 through 46, and 48 through 63, with all counts to run concurrently.

charged against this defendant.   *Id.* at ¶ 4.

On March 15, 2023, the Court, on motion of the government, entered a money judgment against the defendant in the amount of $60,212.49.   *Id.* at ¶16a.

The defendant was initially permitted to appear via penal summons and released on bail conditions.   *Id.* at ¶ 2.   Immediately following the guilty verdict on November 21, 2022, the Court remanded the defendant.   *Id.* at ¶ 16.   Prior to his remand, the defendant complied with all conditions of pretrial release.   *Id.* Furthermore, Bureau of Prisons ("BOP") records reflect that he has not been disciplined for any misconduct.   *Id.*

## II.   RECOMMENDATION

### A.   Nature and Circumstances of the Offense

#### 1.   Overview

The circumstances of the offense are well-known to this Court. The defendant was elected the Business Manager / Financial Secretary ("BM/FS") for International Brotherhood of Electrical Workers ("IBEW") Local Union 1260 in July 2011.   The evidence at trial demonstrated that the defendant inherited a union that was financially sound, had $700,000 in cash reserves and owned a building worth approximately $ 5 million dollars.   The defendant drastically increased local union spending, in particular by hiring additional staff (including several family members) and increasing the frequency and extravagance of local union travel.

3

As a result, in less than five years, (i) the defendant exhausted all of the union's reserves, necessitating a dues increase to keep the local union solvent, (ii) the defendant sold the union's most valuable asset, an office building on Beretania Street, and burned through half of the building proceeds to support operating income prior to the dues increase, and (iii) the defendant locked the local union into an expensive, 12.5 year lease in TOPA Tower costing approximately $250,000 per year, and spent a similar amount on the build-out of the leased space, an expenditure that will be lost when the lease expires.   For all of his ambition to increase union participation and membership, he left the union with fewer members than when he took office - 3,057 at the end of 2011, down to 2,891 at the end of 2015.

       2.    *The Dues Increase Resolution*

By late 2014, due to vastly increased spending, the defendant initiated the process to propose a dues increase to the membership of Local Union 1260.   The Local Union 1260 Bylaws required that "dues, admission fees, and/or assessments shall not be increased except by a majority vote by secret ballot of the members in good standing…."   Several proposed resolutions, including the dues increase resolution, were read at the December 2014 membership meetings of each of the nine voting units and voted on in January 2015.   It was quickly apparent that the dues increase resolution was very unpopular, particularly among the utilities

4

employees who made up a large proportion of Local Union 1260.   For example, the January 2015 meeting with Unit 1, which consisted primarily of HECO employees, was very contentious, and Unit 1 voted against the dues increase 197 (no votes) to 22 (yes notes).   While the dues increase resolution passed in some of the smaller units, taking out Units 4 and 9 (discussed below), the dues resolution was set to fail by a resounding margin, 402 (no votes) to 98 (yes votes).

Unit 4 included the television stations and most of the staff of LU1260, as well as a few other employers.   The meetings were held at the conference room at the Topa Tower offices, and were typically attended by less than 10 people. According to the Unit 4 minutes, the Unit 4 membership meeting occurred on January 19, 2015 and the dues increase resolution passed by a vote of 98 yes votes to 11 no votes.   However, the evidence at trial showed that the minutes were false. The minutes reflected that over 100 members attended and that the votes were counted at the meeting.   The actual meeting had less than 12 persons in attendance, and the votes were not counted at the meeting – rather, they were counted in secrecy by a relative of the Ahakuelo family (the defendant's daughter-in-law's cousin) at his house, with no witnesses present.   According to sign-in sheets, a large proportion of those in attendance were from the TV stations; however, witness testimony at trial showed that the TV members were unaware of the vote and would have voted against the increase if given the opportunity.

Even counting the fake results in Unit 4, Units 1 through 8 cumulatively voted against the dues increase resolution by a total of 196 yes votes to 413 no votes.   At the Unit 9 membership meeting in Guam, the defendant employed two deceptions in order to guarantee a favorable result.   First, the defendant made a promise to the Guam membership that if they voted "yes," their dues would not increase.   The defendant concealed this patently unfair promise from the remainder of the local union membership.   Second, the defendant enlisted several co-conspirators to falsify the vote in Unit 9 by creating fake ballots and substituting the fake ballots for the genuine ballots prior to the votes being counted.   These efforts were successful in that the dues increase passed by a resounding margin at the Unit 9 meeting, and narrowly passed overall.

Between April 2015 and June 2016, the dues increase caused the local union to over-collect dues in the approximate amount of $3,735,963.03, an amount later refunded by the local union to its members after the defendant was removed.   In order to afford this refund, the local union had to borrow significant funds from the International Office of the IBEW, pushing the local union into financial instability.

### 3.   *Embezzlement of Local Union Funds*

The defendant was not charged with embezzlement because he was ambitious, or because he had a grand vision for expanding the local union.   The defendant was charged because his vision included directing significant benefits to

himself and members of his immediate family at the expense of the union members to whom he owed a fiduciary duty.   The evidence at trial demonstrated that by 2015, the defendant had hired five family members to work for the union (his wife, his sister-in-law, his son, his daughter-in-law, and his son-in-law) out of staff of less than 20, and that total salaries to the Ahakuelo family exceed $600,000 per year.   The evidence further showed that the defendant paid himself, his wife, his sister-in-law, and an employee with whom he had an extramarital affair in excess of the amounts dictated by the bylaws and office policies for their respective positions.   From 2014 through May 2016, the local union overpaid these employees by approximately $144,787.   PSR at ¶ 49.   Furthermore, the defendant hired his son-in-law for a salary of $125,000, and from the date of his hire in March 2016 through May 2016, the record showed that the son-in-law did little actual union work.   *Id.* at ¶ 50.   The defendant also authorized the purchase of a truck by the local union from his wife for approximately $25,000, a transaction that directly benefited his family, without authorization by the executive board.

The defendant and his wife, also without authorization, used local union funds to pay for personal travel (Counts 64 through 67).   *Id.* at ¶ 47.   Knowing that he had no local union purpose for this travel, the defendant then fabricated purported carbon copies of reimbursement checks and testified at trial that he and his wife had reimbursed the local union at the time the flights were purchased.   *Id.*

at ¶ 48.   The jury, by its verdict, concluded that this testimony was false.

In total, between the fraudulent dues increase vote and other instances of embezzlement, the defendant defrauded the local union of $3,799,003.75.   *Id*. at ¶ 55.

### B.   History and Characteristics of the Defendant

The defendant has no criminal history.   *Id.* at ¶ 87.

Since leaving employment with the local union, the defendant's employment history and financial condition are poor.   The defendant reported that he was employed by his own firm, Global Institute for Interest Based Solutions from December 2016 through the time of trial.   *Id.* at ¶ 106.   However, the presentence investigation also revealed that the defendant had been terminated for cause from two positions during that time frame.   The defendant was employed as a delivery driver from September 2020 through January 2021, but suspended after he was suspected of stealing a parcel.   *Id.* at ¶ 108.   He was subsequently employed as a box truck driver from April 2021 through September 2021, but terminated for failing to report an accident and vehicle damage.   *Id.* at ¶ 109.

The defendant's financial balance sheet shows a negative monthly cash flow, a negative total net worth, and over $170,000 in credit card, student loan, and vehicle loan debt.   *Id*. at ¶ 111.   The financial analysis further shows that the defendant and his wife purchased a new Mercedes-Benz automobile in 2021, at a

time when this case was pending and the defendant (and his wife) were relying on court-appointed counsel.   The defendant's financial history further showed that he and his wife filed for bankruptcy in 2001.   *Id.* at ¶ 112.   In short, the defendant conducted his personal finances in the same manner he conducted the finances of the local union – spending well in excess of income, with no actual ability or intention to pay the bill when it came due.   While this mindset is regrettable when it comes to family finances, it is criminal when held by a person entrusted to protect the property of hard-working union members.

### C.    The Need for the Sentenced Imposed

18 U.S.C. § 3553(a) includes the need for a sentence to afford adequate deterrence and protect the public.   The business manager of a local union is, by statute, a position of trust that owes a fiduciary duty to the membership of the union.   This case revealed just how easy it was for the defendant to make decisions that benefited himself and his family to the detriment of the membership. Had his co-conspirators remained silent, it is possible that the extent of his fraudulent behavior would have never come to light.   A significant sentence of imprisonment is essential in this case to communicate to all union officers, both in this district and more broadly, that the cost for self-dealing is steep.

### D.    The Kinds of Sentences Available and the Sentencing Range

Based on the defendant's offense level and criminal history category, the

U.S.S.G. suggest a guideline range of 168 to 210 months of imprisonment, followed by 1 to 3 years of supervised release.   *Id*. at ¶¶ 117, 121.   A sentence of probation is not prohibited by statute, but not recommended by the guidelines.   *Id.* at ¶¶ 122-24.

The defendant may raise the fact that the United States Sentencing Commission ("U.S.S.C") has proposed amendments to the sentencing guidelines that are set to take effect in November 2023.   Included in the proposed 2023 amendments is a new section that provides for a two-level decrease for an offender who has zero criminal history points, *unless* certain exclusions apply.   *See* U.S.S.C. § 4C1.1 (*proposed*), available at

https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf (last visited June 12, 2023).   A defendant is excluded from this two-level decrease if he or she received an adjustment under § 3B1.1 (Aggravating Role).   *Id.*   The defendant here received a +4 for leadership role under § 3B1.1.   PSR at ¶ 75.   Therefore, even if the 2023 amendments were in effect, the defendant would not be eligible for this two-level decrease.

### E.   The Need to Avoid Unwarranted Sentence Disparities

In this case, there are five potential comparators – the defendant's wife, Marilyn Ahakuelo, and the four cooperators who testified at trial.   Marilyn Ahakuelo received a sentence of 70 months imprisonment, which was the low-end

of the guidelines.   The four cooperators each received probation sentences (of varying length), fines, and community service.

The cooperators are not appropriate comparators and should not suggest to this Court that the defendant deserves a non-jail sentence.   The cooperators were each enlisted by this defendant to assist in the dues increase vote rigging, they were threatened with loss of their employment (or the loss of future employment), and the benefits they received from their participation were far less significant than those received by the defendant or his family members.   Most importantly, each of the four cooperators met with investigators, admitted their conduct, and agreed to testify both in grand jury and in open court, providing substantial assistance to the government.   These factors set the four cooperating witnesses in a category apart from the defendant.

The defendant's wife is a reasonable data point for this Court to consider. Marilyn Ahakuelo received a significant sentence of imprisonment, and her presentence investigation report did not reflect many of the aggravating circumstances that led to the defendant having a higher offense level – namely, leadership role (¶ 74), abuse of a position of trust (¶ 75), and obstruction of justice (¶ 76).   The same calculus that led the Court to give Marilyn Ahakuelo a guideline sentence justifies a guideline sentence in this case.

###### F.      The Need to Provide Restitution to Any Victims of the Offense

Probation has determined that restitution is mandatory in this case and has calculated that the defendant is personally responsible to pay $209,391.72.   *Id.* at ¶ 60.   The United States agrees.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## III.    Recommendation

The presentence investigation report indicates that the defendant's offense level is 35 and his criminal history category is I, suggesting a guideline range of imprisonment of 168 to 210 months.   Probation has recommended a downward variance to 140 months imprisonment.   In balancing all of the statutory factors, the government respectfully disagrees that a variance is appropriate and recommends that the court impose a guideline sentence of 168 months, followed by three years of supervised release.   Given the defendant's age and family support, a sentence at the low end is sufficient, but not greater than necessary to achieve the goals of sentencing.   Additionally, the government respectfully requests the Court issue an order of restitution in the amount recommended by probation ($209,391.72) as well as a forfeiture money judgment as filed by the government.

DATED: June 13, 2023, Honolulu, Hawaii.

Respectfully Submitted,

CLARE E. CONNORS
United States Attorney
District of Hawaii

By /s/ Michael F. Albanese
  MICHAEL F. ALBANESE
  W. KEAUPUNI AKINA
  Assistant U.S. Attorneys

13

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known address:

Served by ECF:

      Caroline Elliot, Esq.
      Attorney for Defendant Brian Ahakuelo

Served by Hand-Delivery:

      U.S. PROBATION OFFICE
      ATTN: Darsie J.T. Ing-Dodson
      300 Ala Moana Boulevard, Room 2-300
      Honolulu, HI 96850

      DATED: June 13, 2023, Honolulu, Hawaii.

                            */s/ Michael F. Albanese*
                            U.S. Attorney's Office
                            District of Hawaii